53 P.3d 214

STATE of Hawai'i, Plaintiff–Appellee,

v.

Kalawaianui F. CARMICHAEL,
Defendant–Appellant.

No. 22871.

Supreme Court of Hawai'i.

Aug. 29, 2002.

As Corrected Sept. 5, 2002.

As Amended Sept. 9, 2002.

Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, for defendant-appellant.

Mark R. Simonds, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., and NAKAYAMA, J.; RAMIL, J.

Opinion by MOON, C.J., in which NAKAYAMA, J., joins; RAMIL, J., concurring in the result.

Defendant-appellant Kalawaianui F. Carmichael appeals from the September 23, 1999 judgment of conviction and sentence of the Circuit Court of the Second Circuit. Carmi-

chael contends that the circuit court, the Honorable Shackley Raffetto presiding, abused its discretion in denying Carmichael's motion to dismiss a charge of promoting a dangerous drug in the third degree as a de minimis offense. For the following reasons, we affirm both the circuit court's denial of the motion to dismiss and its judgment of conviction and sentence.

## I. BACKGROUND

On February 13, 1999, Maui Police Department (MPD) Officer Christopher Horton observed a vehicle driven by Carmichael traveling between 84 and 86 miles per hour on a road with a speed limit of 30 miles per hour. Officer Horton stopped Carmichael's vehicle and spoke to him. Officer Horton detected an odor of alcohol from Carmichael, who slurred his words as he spoke. Carmichael initially admitted to drinking one, then two, beers. Minutes later, Carmichael told Officer Horton that he had drunk "three 40 ounce Mickey's." Carmichael appeared unsteady on his feet, and his field sobriety test revealed other signs of impairment. He was arrested for driving under the influence of intoxicating liquor, in violation of Hawai'i Revised Statutes (HRS) 291-4 (Supp.1999).[1]

At the Wailuku police station, Carmichael elected to take a breath alcohol test, which revealed an alcohol content of .096. While "processing" Carmichael, MPD Officer Robert Harley did a pat-down search and recovered from Carmichael's sock: (1) a glass pipe containing a white crystalline substance and a brown, burnt substance; (2) two metal scrapers; (3) a small plastic straw with one end heat-sealed and the other cut at an angle; and (4) several ziplock bags containing "a light rock residue visible to the naked eye."

On April 12, 1999, Carmichael was charged by grand jury indictment with: (1) driving

1. HRS § 291-4 states in pertinent part:
 (a) A person commits the offense of driving under the influence of intoxicating liquor if:
 (1) The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor, meaning that the person concerned is under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty; or
 (2) The person operates or assumes actual physical control of the operation of any vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath.

under the influence of intoxicating liquor (Count I); (2) promoting a dangerous drug in the third degree, in violation of HRS § 712–1243 (1993 & Supp.1999)[2] (Count II); and (3) prohibited acts related to drug paraphernalia, in violation of HRS § 329–43.5(a) (1993)[3] (Count III). On June 4, 1999, Carmichael filed a motion to dismiss Count II of the indictment, claiming that his alleged violation of HRS § 714–1243 constituted a de minimis infraction, pursuant to HRS § 702–236 (1993).[4]

A hearing on Carmichael's motion was held on December 27, 1999. Both parties stipulated that Julie Wood, an expert in the field of drug identification, tested the evidence recovered from Carmichael. The parties stipulated that Wood's testimony would have been that the substance tested in the instant case was visible to the naked eye, and the parties agreed to admit into evidence a lab report prepared by Wood. Wood's lab report indicated that .002 grams of a substance containing methamphetamine was recovered from the glass pipe taken from Carmichael. The report also indicated that the white residue on the plastic straw and in the ziplock bags was of an insufficient amount for analysis.

The defense called George W. Read, Ph.D., Emeritus Professor of Pharmacology at the University of Hawai'i. Dr. Read was qualified as an expert in the field of pharmacology, "the study of actions of drugs in an organism, especially man, humans." He testified that methamphetamine is a central nervous system (CNS) stimulant that has been medically accepted for use in the treatment of obesity, narcolepsy, attention deficit hyperactive disorder (ADHD), and fatigue.[5] The defense offered into evidence[6] a chart, prepared by Dr. Read, indicating that the ranges of methamphetamine dosages used to treat obesity, narcolepsy, ADHD, and fatigue are: .01 to .04 grams; .005 to .06 grams; .005 to .015 grams; and .01 to .04 grams, respectively. Dr. Read testified that the doses indicated on his chart were based upon pure methamphetamine taken orally in pill form. He also testified that at least one manufacturer makes .0025 gram tablets of methamphetamine to treat ADHD in children.

With respect to the abuse of methamphetamine, Dr. Read testified that a "naive user,"

---

**2.** HRS § 712–1243 states in pertinent part:

(1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

. . . .

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

**3.** HRS § 329–43.5(a) states in pertinent part:

It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction

may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

**4.** HRS § 702–236 provides in pertinent part:

(1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:
(a) Was within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or
(b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or
(c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

**5.** Dr. Read described the use of methamphetamine to treat fatigue as "a borderline acceptable use."

**6.** Although not reflected on the Exhibit list, the transcript of the hearing indicates that the chart was admitted into evidence without objection.

that is, one who had not developed a tolerance for methamphetamine, would use between .05 and .1 grams to achieve a feeling of "euphoria and elation." Dr. Read referred to an amount of methamphetamine used to achieve euphoria and elation as a "street dose," an "illicit use dose," and an "illicit dose." He also noted that researchers in one of the studies he reviewed had used .03 grams of methamphetamine for a 70 kilogram person as "the low end of the street dose." Dr. Read concluded that .002 grams of methamphetamine[7] would not be saleable, would not be effective as an illicit dose, and would not produce a pharmacological effect. Dr. Read further testified that residue recovered from a pipe "is going to be almost all inert material with very little drug."

On cross-examination, Dr. Read explained that inhaling a drug will result in a greater effect with a smaller dose than ingesting the same drug orally. Dr. Read also stated that he had neither met nor examined Carmichael and indicated that he did not know if Carmichael had a history of drug use.

The circuit court inquired as to how alcohol in Carmichael's system would interact with methamphetamine. Specifically, the court asked:

> The evidence here is that as I understand it from the memorand[a] is [Carmichael] was arrested for driving under the influence of alcohol, told the police he was driving his car at an excessive speed, told the policeman he drank three, forty-ounce Mickeys, and when he got to the police station they gave him a breath test and had, I think .096 blood alcohol content. That will affect the effect the ingestion of methamphetamine would have on a person, would it not?

Dr. Read stated that alcohol and methamphetamine would work in opposition to each other and, if anything, the methamphetamine "would have made him more alert and less drunk than he would appear with the alcohol alone" and that, "in his behavior to the arresting cop, he would have appeared slightly less drunk with the CNS stimulant in his system." Upon further questioning by the prosecution, Dr. Read indicated that methamphetamine use would not affect the rate of elimination of alcohol from the human body in any manner.

MPD Officer Michael Callinan, assigned to the vice and narcotics division, testified for the prosecution. Officer Callinan identified the pipe recovered from Carmichael as one used to smoke crystal methamphetamine. He indicated that methamphetamine is usually loaded into the ball end of the pipe with a cut straw. The ball end of the pipe is then heated with an open flame, and the user inhales the methamphetamine from the cylindrical end of the pipe. Officer Callinan explained that the plastic straw recovered from Carmichael was of the type used to load methamphetamine into a pipe for use or to load the drug into smaller packets for distribution. With respect to the metal scrapers, he also testified that a user who "is low on their product" will sometimes "scrape the residue into a grouping or small bunch, and then . . . resmoke the residue."

In their arguments, both the defense and the prosecution focused on the amount of methamphetamine recovered in the instant case. The defense argued, *inter alia*, that Count II of the indictment should be dismissed as a de minimis infraction because "the .002 grams containing methamphetamine has no pharmacological effect according to Doctor George Read. Therefore, the Court should find this amount is unusable for use or sale and falls within the purview of the language of *State v. Vance*." Based upon Dr. Read's testimony that .002 grams was a measurable amount and Officer Callinan's testimony regarding the practice of "scraping the inside of the glass pipe in order to heat residue and smoke it," the prosecution argued that a useable amount of methamphetamine was recovered from Carmichael.

The circuit court denied Carmichael's motion to dismiss, noting:

> We know that the Vance case was talking about cocaine, for which there's no mandatory sentencing. We do know the

7. Dr. Read's conclusions were expressed in response to questions by defense counsel; however, it is not clear whether defense counsel's references to ".002 grams" pertained to the substance recovered in the instant case or pure methamphetamine.

legislature in addition to prohibiting possession of any amount of drug, methamphetamine, in fact requires mandatory jail terms for possession of this particular drug, so it reemphasized its intent that this is a serious drug and that the potential for harm to our society is very high.

In this case the amount that was—well, let me take a step. I think the de minimis standard is essentially intended for a situation such as where a person borrows the car of another person and then they are arrested and they find some small amount of drugs in the ashtray or something like that, or circumstances that don't indicate the person was actively smoking, or ingesting the drug or using the drug.

Not that it is just—I don't think it is intended to provide a bright line for a certain amount, and also it is apparent that even the Supreme Court is using the wrong terminology, that is to say the word narcotic. Apparently, that's not appropriate for use with the drug methamphetamine. I am interpreting that to mean any effects on the central nervous system.

The expert talked about, well, what he means street use, how much does it take to get a person high, which is problematical, because you have all these variables, what their tolerance might be, how much they weigh, how pure it is. We know, for instance, that a therapeutic amount is as low as .0025, and apparently pills are available in that amount for treatment for attention deficit disorder, so it is hard to say .002 is just not meant to be concerned about when we're talking about methamphetamine, and I think I have to take into consideration the circumstances here.

What is in evidence is that this was a pipe which is commonly used for smoking methamphetamine, that residue in a pipe can be commonly used by people to smoke methamphetamine, and I just don't feel in the totality of the circumstances of this case that I should exercise discretion of the Court and find that this was a de minimus [sic] infraction, so I am going to deny the motion.

A written order denying Carmichael's motion to dismiss was filed on July 23, 1999.

On July 29, 1999, Carmichael withdrew his plea of not guilty and entered pleas of no contest to Count I and Count III. With respect to Count II, Carmichael entered a conditional plea of no contest, reserving his right to appeal the issues in this case. The court accepted his pleas and, on September 23, 1999, sentenced Carmichael to, *inter alia*, imprisonment for five days and a 90-day suspension of his driver's license for Count I; a five-year term of imprisonment with a 30-day mandatory minimum term for Count II; and a five-year term of imprisonment for Count III. All terms were to run concurrently. On October 4, 1999, Carmichael timely filed a notice of appeal.

## II. STANDARDS OF REVIEW

 Before a trial court can address whether to dismiss a prosecution on de minimis grounds, it must first make factual determinations regarding both the conduct alleged and the attendant circumstances, which are reviewed under the clearly erroneous standard. *State v. Viernes,* 92 Hawai'i 130, 133, 988 P.2d 195, 198 (1999) (citations omitted). A trial court's decision under HRS § 702–236, governing de minimis infractions, is reviewed for an abuse of discretion. *Id.*

## III. DISCUSSION

At the outset, we note that our plurality decision in this case is consistent with the decision and analysis in *Viernes. See id.* at 135, 988 P.2d at 200. Additionally, we note that Carmichael raises no challenge regarding Counts I and III. Therefore, we leave the judgment of conviction and sentence for these counts undisturbed. Additionally, Carmichael does not challenge any of the circuit court's findings of fact. Thus, this court may accept the circuit court's findings as the operative facts of the case. *See Robert's Hawai'i School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.,* 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999) (citation omitted); *but cf. Hawai'i* Rules of Appellate Procedure Rule 28(b)(4) (2000) (an appellate court, at its option, may notice a plain error not presented).

 In the present case, the police recovered from Carmichael: one glass pipe used

to smoke methamphetamine; one plastic straw with one end heat-sealed and the other end cut at an angle, which, according to the testimony, is typically used to load crystal methamphetamine into a pipe for use and to load the drug into smaller packets for distribution; two metal scrapers typically used to scrape residue from a pipe in order to re-smoke it; and several ziplock bags of various sizes, each containing a white residue. Additionally, the court noted that Carmichael was driving at an excessive speed immediately prior to being pulled over by the police and that he had a breath alcohol content of .096. Further, Carmichael's field sobriety test suggested that he was impaired.

■ As the party advancing the motion to dismiss on de minimis grounds, the defendant bears the burden of establishing that the alleged conduct constituted a de minimis infraction. *See generally State v. Balanza,* 93 Hawai'i 279, 283–85, 1 P.3d 281, 285–87 (2000). Thus, the defendant must adduce evidence regarding both the conduct alleged and the attendant circumstances in order to support a finding that the alleged conduct was de minimis. However, both at the hearing and on appeal, the defense focused on whether the amount of the drug possessed constituted a useable amount. The record indicates that the defense did not adduce any evidence or present any argument with respect to the attendant circumstances, including: (1) Carmichael's possession of multiple items associated with the use and distribution of methamphetamine; (2) his driving at excessive speed immediately prior to being apprehended; and (3) the arresting officer's determination that Carmichael appeared impaired. By failing to address these attendant circumstances, the defense failed to meet its burden of providing evidence to support a finding that the conduct alleged "did not

actually cause or threaten the harm or evil sought to be prevented by [HRS § 712–1243] or did so only to an extent too trivial to warrant the condemnation of conviction." [8] *See* HRS § 702–236. Given the inadequate record presented by the defense, the circuit court did not clearly err when it found, based upon its expressed consideration of "the totality of the circumstances of this case[,]" that Carmichael's alleged conduct did not constitute a de minimis infraction.[9] *See State v. Sanford,* 97 Hawai'i 247, 256, 35 P.3d 764, 773 (App.) (upholding the circuit court's denial of a motion to dismiss a charge as de minimis based upon, *inter alia,* "the juxtaposition of drug repositories, smoking device and smoked residue, and especially the possession of such depleted drug contraband by one engaged in shoplifting"), *cert. denied,* 97 Hawai'i 247, 35 P.3d 764 (2001). Accordingly, the circuit court did not abuse its discretion in denying the motion to dismiss.

## IV. *CONCLUSION*

For the foregoing reasons, we affirm the order denying Carmichael's motion to dismiss and the judgment of conviction and sentence of the circuit court.

Dissenting in Part and Concurring in Part Opinion by RAMIL, J.

Although I agree with the result reached by the plurality, Moon, C.J., joined by Nakayama, J., I respectfully dissent from the plurality's analysis. For the reasons discussed below, I believe that *State v. Viernes,* 92 Hawai'i 130, 988 P.2d 195 (1999), was wrongly decided and should be overruled. After *Viernes,* which I joined, the prosecution repeatedly requested that this court revisit the issue.[1] Having done so, I now feel compelled to file a dissenting opinion.

---

8. When the attendant circumstances so warrant, we believe dismissal of a charge of promoting a dangerous drug in the third degree as a de minimis offense is consistent with the intent of the legislature. For example, in a case where the evidence demonstrates that a defendant had knowingly recovered a quantity of methamphetamine with the intent to deliver it to the police as evidence of a crime when he was arrested and charged for possessing "any amount" of a dangerous drug, dismissal as a de minimis offense

would clearly be warranted. Therefore, we respectfully disagree with Justice Ramil.

9. We respectfully disagree with Justice Acoba's characterization of our analysis and disagree with his opinion generally.

1. *See, e.g., State v. Oughterson,* Cr. No. 99–1326 (1st Cir.Haw., Dec. 10, 1999) (prosecution appealing the circuit court's holding that .012 grams of cocaine substance is *de minimis* ), *ap-*

In *Viernes*, we held that "conduct may be so harmless that, although it technically violates HRS § 712–1243, it is nonetheless *de minimis* pursuant to HRS § 702–236." *Id.* at 135, 988 P.2d at 200. The question is whether the legislature intended to proscribe the possession of "any" quantity of drug (as stated in HRS § 712–1243), or whether the legislature intended to proscribe only the possession of usable quantities capable of producing an effect (as held in *Viernes*). A fresh look at plain meaning and statutory intent steers me to the ineluctable conclusion that Hawai'i Revised Statutes (HRS) § 702–236 (1993) may not be applied to HRS § 712–1243 (1993 and Supp.2000) possession cases, and that accordingly, *Viernes* must be overruled.

## I.

In interpreting statutes that appear to relate to the same subject matter, this court has adopted three rules of statutory construction:

First, legislative enactments are presumptively valid and should be interpreted in such a manner as to give them effect. Second, laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another. Third, *where there is a plainly irreconcilable conflict between a general and a specific statute concerning the same subject matter, the specific will be favored.* However, where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored.

*State v. Putnam*, 93 Hawai'i 362, 373, 3 P.3d 1239, 1250 (2000) (quoting *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 54–55, 868 P.2d 1193, 1201–02, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994), *judgment aff'd*, 124 F.3d 1150 (9th Cir.1997) (internal quotation marks, brackets, and cita-

tions omitted) (emphasis added)). The pivotal determination to be made is whether HRS § 712–1243 and HRS § 702–236 are in conflict, or if they merely overlap.

I begin my analysis by first interpreting HRS § 712–1243. The court's "foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." *Putnam*, 93 Hawai'i at 367, 3 P.3d at 1244 (quoting *Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (citations omitted)). The language of HRS § 712–1243 is clear and unambiguous. HRS § 712–1243 provides in relevant part:

Promoting a dangerous drug in the third degree. (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

. . . .

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. . . .

HRS § 712–1243(1) prohibits the illegal possession of dangerous drugs, expressly employing the phrase "in any amount." Accordingly, one might ask, what part of the word "any" do we not understand? In my view, the phrase "in any amount" creates the inference of a zero tolerance policy that

peal filed, No. 23075 (Haw., Jan. 7, 2000). In addition, defendants have also raised this issue by appealing their convictions. In the instant case, Carmichael is appealing the circuit court's holding that holding that .002 grams of methamphetamine substance is not *de minimis*. *See also*

*State v. Fukagawa*, Cr. No. 99–0020(2) (2d Cir. Haw., Aug. 31, 1999) (defendant appealing the circuit court's holding that .018 grams of methamphetamine substance is not *de minimis*), appeal filed, No. 22810 (Haw., Sept. 13, 1999).

leaves no room for discussion on the quantity of drug possessed.[2]

Second, the statutory scheme and the purpose of the statute support the clear and unambiguous language of HRS § 712–1243. In comparing the minimum quantities selected by the legislature for "dangerous drug" offenses and the minimum quantities selected for other related offenses, it becomes clear that the legislature consciously treated "dangerous drugs" with a heightened level of severity. The Commentary to Sections 712–1241 to 1250 explains that HRS §§ 712–1241 to 1250 "set forth four different offenses relating to drugs and intoxicating compounds. The offenses are: 1) promoting a dangerous drug; 2) promoting a harmful drug; 3) promoting a detrimental drug; and 4) promoting intoxicating compounds." Commentary on HRS §§ 712–1241 to 1250. Of the four different offenses, only the sections pertaining to "dangerous drugs" include the "any amount" language. *Compare* HRS §§ 712–1241 to 1243 *with* HRS §§ 712–1244 to 1250.

The legislature's statutory scheme further indicates that the possession of "any amount" is intended to be an indismissible violation of the act. As noted in *State v. Vance*, 61 Haw. 291, 602 P.2d 933 (1979), "HRS § 712–1243 is part of a statutory scheme designed to provide more severe punishment for possession of greater quantities of drugs.... The statutory design indicates that the Legislature not only carefully considered the precise amount of a drug that need be possessed to constitute an offense under the relevant statute but that they devised their entire scheme of sanctions on the basis of the amounts involved." *Vance*, 61 Haw. at 306–07, 602 P.2d

at 943–44. Thus, it cannot be presumed that the legislature accidentally or unwittingly designated "any amount" as the amount forbidden, or that the legislature did not envisage possession of trace amounts as an offense under HRS § 712–1243. In fact, it appears that the legislature specifically aimed to make trace amounts sufficient to warrant prosecution and conviction.

The language within subsection (3) of HRS § 712–1243 also demonstrates the legislature's intent to have a zero tolerance policy. In its 1996 amendment, the legislature added a clause that began with the words "[n]otwithstanding any law to the contrary," and provided for mandatory minimum terms of imprisonment for offenses involving methamphetamines. HRS § 712–1243(3) (1972) (added by Act 308, Session Laws 1996). This sweeping language evidences the legislature's determination to aggressively eliminate the use of drugs in our society. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (stating that "[a] clearer statement [than a 'notwithstanding' clause] is difficult to imagine" (citations and internal quotations omitted)).

Finally, the legislative history of HRS § 712–1243 advises the court of the legislature's intent. "In addition to examining the language in a statute, the courts, when interpreting statutes, may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool." *Putnam*, 93 Hawai'i at 367, 3 P.3d at 1244. The legislative purpose of HRS § 712–1243 is to "respond to 'abuse and social harm,' " *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (quoting Hse. Conf. Comm. Rep. No. 1, in 1972 House Journal, at

2. This court has previously stated,

But we have rejected an approach to statutory [interpretation] which limits us to the words of a statute, no matter how clear they may appear upon perfunctory review. For we recognize "our primary duty [in interpreting statutes] is to ascertain the intention of the legislature and to implement that intention to the fullest degree," and where "there is ... material evidencing legislative purpose and intent, there is no reason for a court to seek refuge in 'strict construction,' 'plain meaning,' or 'the popular sense of the words.' "

We therefore turn to the history of [the statute] to ascertain whether the legislature might

have had another meaning in mind when it adopted the language in question. But "we do so with the recognition that only [a clear] showing of contrary intentions from that data would justify a limitation on the 'plain meaning' of the statutory language."

*Kaiama v. Aguilar*, 67 Haw. 549, 696 P.2d 839 (1985) (internal citations omitted). Accordingly, despite the plain and unambiguous meaning of the phrase "in any amount," I shall nonetheless proceed to consider other aids to ensure a proper determination of the legislative intent of HRS § 712–1243.

1040), and to "counter increased property and violent crimes." *Id.* (quoting 1996 Haw. Sess. L. Act 308, at 970). To effectuate these goals, the legislature created a statutory scheme and used language that would incontrovertibly set the minimum quantities at "any amount."

Turning now to whether there is a conflict between HRS § 712–1243 and HRS § 702–236, I now examine HRS § 702–236, which provides in relevant part:

De minimis infractions. (1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:

. . . .

(b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

(c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

(2) The court shall not dismiss a prosecution under subsection 1(c) of this section without filing a written statement of its reasons.

Application of HRS § 702–236 would result in a judgment or order of dismissal. Juxtaposing HRS § 712–1243 and HRS § 702–236, however, reveals an irreconcilable conflict. The gravamen of the offense created by HRS § 712–1243 is the knowing and unlawful possession of a dangerous drug. The statute neither specifies nor implies that a defendant must possess a particular quantity of a dangerous drug. Thus, the state must prove only the knowing, unlawful possession of a dangerous drug, and the quantity of the drug possessed is relevant only insofar as it establishes or disproves any of these elements. As HRS § 712–1243 makes criminal the possession of a dangerous drug, it cannot be reasonably argued that even a minuscule quantity would negate penal liability. Thus,

in accordance with statutory construction, the court is compelled to favor HRS § 712–1243, a specific statute, over HRS § 702–236, a general statute.

## II.

In addition to and in light of the above analysis, *Viernes* should be overruled because the *Viernes* court made the following errors: (1) the court inadvertently applied the usable quantity standard; (2) the court misunderstood the legislative intent of HRS § 702–1243; and (3) the court misapplied HRS § 703–236.

Somewhat ironically, it was upon the very analysis outlined in section I that the *Vance* and *Viernes* courts rejected the usable quantity standard. The *Vance* court examined the statutory scheme to determine legislative intent, and concluded that "the direct and unambiguous language of [HRS § 712–1243] prohibits [the court] from judicially amending the provision to include a usable quantity standard." *Vance*, 61 Haw. at 306–07, 602 P.2d at 943–44; *see also Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (examining the legislative history of HRS § 712–1243; rejecting the usable quantity standard). The *Viernes* court agreed, stating that "[a]s pointed out in *Vance*, the determination of the amount of a drug necessary to constitute an offense falls solely within the purview of the legislature." *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199. What the *Viernes* court failed to realize, however, is that application of the *de minimis* statute is nothing more than a disguised application of the "usable quantity standard." To reach the conclusion that .001 grams of methamphetamine was *de minimis*, the *Viernes* court first determined that such amount "was infinitesimal and was neither *usable* nor saleable." *Id.* (emphasis added).[3] For the State to have prevailed in *Viernes*, the prosecution would have needed to prove that .001 grams of methamphetamine was "usable." The State thereby would have been required to satisfy the "usable quantity

---

**3.** In the instant case, the circuit court held that .002 grams of methamphetamine substance is not *de minimis*. *Cf. Fukagawa*, Cr. No. 99–0020(2) (2d Cir.Haw., Aug. 31, 1999) (holding

that .018 grams of methamphetamine substance is not *de mininis* ); *Oughterson*, Cr. No. 99–1326 (1st Cir.Haw., Dec. 10, 1999) (holding that .012 grams of cocaine substance is *de ininimis* ).

standard" that the *Viernes* court itself reject-ed.

To augment its inconsistent logic, the *Viernes* court then took the "usable quantity standard" one step further. The prosecution had argued that "inasmuch as the .001 grams of methamphetamine could be injected or smoked, it was useable." *Id.* at 134 n. 6, 988 P.2d at 200 n. 6. The court responded by differentiating between "usable substances" and "substances useable as a narcotic." *See id.* The differentiating factor was whether or not the substance could produce an "ef-fect." *Id.* Thus, the court required not only that the substance be usable, but that it also produce an effect. *See id.* There is no legislative qualifier that only possession of "a usable amount that will produce an effect" be forbidden. Accordingly, the court's creation of such a standard was impermissible judicial legislation.

The *Vance* and *Viernes* courts miscon-strued the legislative intent of HRS § 712–1243. Both courts focused on the part of the *de minimis* statute that provides that an offense may be *de minimis* where it "[d]id not actually cause or threaten the harm or evil sought to be prevented by the law defin-ing the offense or did so only to an extent too trivial to warrant the condemnation of convic-tion." HRS § 702–236(1)(b). The error made in the *Vance* dicta, upon which the *Viernes* court relied, was determining that since the legislature wanted to curtail the use of narcotics, quantities too small to be used do not pose the sort of societal danger con-templated. *See Vance*, 61 Haw. at 307, 602 P.2d at 944 (suggesting that a "microscopic" or "infinitesimal" amount that is "unusable as a narcotic . . . may be inconsistent with the rationale of the statutory scheme of narcotics control."); *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (quoting *Vance*, 61 Haw. at 307, 602 P.2d at 944). Although the courts them-selves recognized that "[t]he evil sought to be controlled by [HRS § 702–1243] is the *use of narcotic drugs* and their sale or transfer for ultimate use," *id.* (emphasis added), they failed to give full effect to the goal of control-ling the "use of narcotic drugs." In applica-tion, the courts took the very narrow ap-proach that it would control the "future use

of the particular drugs found." They neglect-ed to consider that in the larger context of drug trafficking, future use is deterred pre-cisely by making it illegal, as HRS § 712–1243 does, to possess drugs. The legislature drafted drug laws that attack both the supply and the demand side of drug distribution. HRS § 712–1243, entitled "Promoting a dan-gerous drug in the third degree," leaves no doubt that the legislature views possession as part and parcel of the drug proliferation problem. Where possession of drugs, re-gardless of the amount, is squarely what the legislature sought to control, it cannot be concluded that possession of "mere trace amounts" of dangerous drugs does not cause or threaten the harm or evil sought to be prevented.

In short, as "[t]raffic in narcotics can hard-ly be said to be a de minimis offense," *State v. Schofill*, 63 Haw. 77, 84, 621 P.2d 364, 370 (1980) (citing *State v. Caldeira, Jr.*, 61 Haw. 285, 602 P.2d 930 (1979)), possession of trace amounts is not too trivial to warrant a convic-tion. Accordingly, possession of dangerous drugs, whether or not they have a future use or are themselves saleable, was intended to be an offense under HRS § 712–1243. An interpretation favorable to drug addicts and those illegally dealing in narcotics cannot reasonably be given.

The *Viernes* court misapplied HRS § 702–236. HRS § 702–236, entitled "De minimis infractions," was intended to be applied to *infractions* that are *de minimis*, not *amounts* that are *de minimis*. The underly-ing rationale of HRS § 702–236 indicates that the legislature intended "to make the court's power to dismiss a prosecution discre-tionary upon the finding that the *conduct* constituted a deminimis [sic.] infraction." Supplementary Commentary to HRS § 702–236 (quoting Sen. Conf. Com. Rep. No. 2, in 1972 Senate Journal, at 741; Hse. Conf. Com. Rep. No. 2, in 1972 House Journal, at 1042) (emphasis added). Thus, for the pur-poses of HRS § 702–236, the term "*de min-imis*" applies to the defendant's "conduct" or "infraction," not to an isolated material ele-ment of a crime, to wit, "amount." More-over, in *State v. Park*, this court adopted a "totality of the circumstances" test for deter-

mining whether an offense is to be treated as a *de minimis* infraction. *State v. Park*, 55 Haw. 610, 616, 525 P.2d 586, 591 (1974) (stating that "before the code's [§ ] 236 can be properly applied in a criminal case, all of the relevant facts bearing upon the defendant's conduct and the nature of the attendant circumstances regarding the commission of the offense should be shown to the judge.")[4]. The *Viernes* court erred by applying HRS § 702–236 to the amount of drug possessed, rather than to the defendant's conduct. And rather than apply *Park's* "totality of the circumstances" test, it examined only the quantity of the drug at issue. Based on its analysis, the *Viernes* Court thus incorrectly held that "the circuit court did not abuse its discretion in determining that .001 grams of methamphetamine was de minimis pursuant to HRS § 702–1243." *Viernes*, 92 Hawai'i at 135, 988 P.2d at 200.

## III.

An overruling of *Viernes* is also independently compelled by public policy considerations. Policy considerations weigh in favor of precluding application of HRS § 702–236 to drug possession cases.

First, dismissal of a possession charge as *de minimis* would not only fail to further the legislative goals behind the drug laws, but would in fact exacerbate the drug problem sought to be eliminated. In cases where drug residue is found in a glass pipe, the question can reasonably be posed: What happened to the rest of the drugs in the pipe before it was confiscated by the police? A reasonable inference can be drawn that it was previously used by either the defendant or some other party. By applying the *de minimis* statute to such a situation, the court would effectively be rewarding the person who uses more (as opposed to less) of the drug.

Second, permitting application of the *de minimis* statute to drug possession cases has distorted trials so that the issue becomes what amount of drug was recoverable, and what "discernible effect" that drug has. For example, in the instant case, the defense's expert witness distinguished between an "illicit use dose" and a "therapeutic dose." He stated,

> I'm making an assumption here that the abuser is seeking the elation and euphoria. I don't see why a person—I don't think you could call it abusive. They are treating obesity. That's a therapeutic thing, so I am making a mental definition here that they are going for the elation or euphoria.

On this basis, he estimated that the minimum amount of methamphetamine required for a "nonuser" to experience "the desired effect of elation and euphoria" was within a "starting dose" "range of .05 to .1" grams. *See also* plurality 99 Hawai'i at 78, 53 P.3d at 217.[5] The legislature could not have intended that the court become an arena where criminal culpability is determined based on quantities other than those legislatively designat-

---

**4.** Some of these factors that should be considered by the judge on this question under the code's s 236(1)(b) should include the following: the background, experience and character of these defendants-appellees which may indicate whether they knew of, or ought to have known, the requirements of HRS s 11–193 (Supp. 1972); the knowledge on the part of these defendants-appellees of the consequences to be incurred by them upon the violation of the statute; the circumstances concerning the late filing of these statements of expense; the resulting harm or evil, if any, caused or threatened by these infractions; the probable impact of these violations upon the community; the seriousness of the infractions in terms of the punishment, bearing in mind, of course, that the punishment can be suspended in proper cases; the mitigating circumstances, if any, as to each offender; the possible improper mo-

tives of the complainant or the prosecutor; and any other data which may reveal the nature and degree of the culpability in the offense committed by each defendant-appellee.
*Park*, 55 Haw. at 617, 525 P.2d at 591.

**5.** In *Fukagawa*, the defense attorney asked its expert witness, "Doctor Read, in your expert opinion would eighteen milligrams or .018 grams produce a euphoric or pharmacological effect for an illicit user?" *Fukagawa*, Cr. No. 99–0020(2) (2d Cir.Haw., Aug. 31, 1999). In *Oughterson*, the defense attorney asked its expert witness, "Taking a naive user, what is the minimum dose amount that could create a CNS [central nervous system] or euphoric effect ...," and "Given your research and your literature that you reviewed, is either ....012 grams or .005 grams saleable?" *Oughterson*, Cr. No. 99–1326 (1st Cir.Haw., Dec. 10, 1999).

ed.[6] In fact, the legislature sought to avoid a battle of the experts by specifically making criminal "any amount." For the court to establish the minimum standard through a parade of case law would require the court to substitute its wisdom for that of the legislature.

Third, application of HRS § 702–236 to drug possession cases is destined to lead to contradictory, if not absurd, results.[7] If expert testimony is permitted to establish criminal culpability thresholds, the result could well differ from courtroom to courtroom and expert to expert. For example, in the instant case, the defense's expert witness testified that "bigger people require more, and smaller people require less." Justice Acoba states,

> In light of the unrebutted evidence produced at trial, that amount, as conservatively estimated by [defense's expert witness] would be .05 grams ... as a first time dose for an "average-sized" person, who was not a user. The only qualification on that amount elicited from [defense's expert witness] was that a "little less" would produce an effect in an eighty-pound person—clearly a qualification not applica-

ble to the five-foot, eight-inch, 115–pound adult Defendant in the instant case.

Acoba, J., dissenting 99 Hawai'i at 95, 53 P.3d at 234. It requires little imagination to envision how "expert testimony" thresholds create the kind of uneven administration of justice that courts must avoid.

Finally, if the test were to be applied to refer to the amount appropriate for a particular defendant's use, it would require testimony involving the defendant's past drug use or habits. For example, in the instant case, the defense's expert witness stated, "depending upon how much a person has used it, it will take more to get the same effect."[8] Introduction of such evidence, however, would bring the court close to if not within the constitutionally prohibited area regarding defendant's status as an addict. *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

### IV.

The *Viernes* court misconstrued HRS § 712–1243, ignoring the legislature's clear purpose in drafting it. It rejects all of the relevant reasoning in *Vance*, and offers a substitute rationale that appears inconsistent with legislative goals and with basic statutory

---

6. As a note, not only has the courtroom usurped legislative authority to establish the minimum quantities for criminal culpability, but such quantities are in fact currently being established by a single person. Professor Read was the expert witness in the instant case, in *Viernes*, 92 Hawai'i at 130, 988 P.2d at 195, in *Fukagawa*, Cr. No. 99–0020(2) (2d Cir.Haw., Aug. 31, 1999), and in *Oughterson*, Cr. No. 99–1326 (1st Cir. Haw., Dec. 10, 1999). In effect, Professor Read has become the legislature and the judge in all of these drug possession cases.

7. I cannot agree with the plurality's following hypothetical: "For example, in a case where the evidence demonstrates that a defendant had knowingly recovered a quantity of methamphetamine with the intent to deliver it to the police as evidence of a crime when he was arrested and charged for possessing 'any amount' of a dangerous drug, dismissal as a de minimis offense would clearly be warranted." Plurality 99 Hawai'i at 80, 53 P.3d at 219. First, I question whether such an individual would even be charged by the prosecution—to my knowledge, never has the situation imagined by the hypothetical ever transpired. Second, I am dubious that the court should seek to protect against unlikely

scenarios, while ignoring the realities of what is occurring in practice—that is, that trial and appellate courts are frequently misapplying the *de minimis* statute to dismiss cases based on the quantity of drug that is recovered. *See* my discussion *supra* n. 1 (describing other cases on appeal). Third, I find the hypothetical to be ineffectual, for the plurality necessarily suggests that it finds it conceivable that the police officer, when receiving the methamphetamine, would also require the protections of the *de minimis* statute. Accordingly, I am not persuaded that the plurality has adequately presented a hypothetical that prevents this court from overruling *Viernes*.

8. In *Fukagawa*, Dr. Read testified as to the effects on an "average normal person." On cross-examination, the prosecution established that Dr. Read had not accounted for, inter alia, "[defendant's] drug use history." *Fukagawa*, Cr. No. 99–0020(2) (2d Cir.Haw., Aug. 31, 1999). In *Oughterson*, the prosecution's expert witness testified that "Cocaine's one of those drugs that's really highly variable in its responses," to which the prosecuting attorney asked, "[A] person himself is a main variable? ... And their weight and their tolerance and all of that?" *Oughterson*, Cr. No. 99–1326 (1st Cir.Haw., Dec. 10, 1999).

interpretation. It also unambiguously overrules the main holding in *Vance,* though it gingerly avoids stating that it is overruling the case itself. Finally, it latches on to the dicta in *Vance,* heedless of the rule that where the legislature has spoken clearly and unambiguously, the court may not elect to rewrite the statute. Because I am of the notion that error once committed should not be perpetuated, I respectfully dissent.

### Dissenting Opinion by LEVINSON, J.

I agree with Justice Acoba that: (1) on the record in this case, the circuit court abused its discretion in denying Carmichael's motion to dismiss Count II of the indictment— charging him with promoting a dangerous drug in the third degree in violation of HRS § 712–1243 (1993 & Supp.1999)—as *de minimis* pursuant to HRS § 702–236 (1993), *see* Justice Acoba's dissenting opinion 99 Hawai'i at 88, 53 P.3d at 227; (2) contrary to Justice Ramil's view, "there is no conflict between HRS § 702–236 and HRS § 712–1243, and, accordingly, both statutes are to be given application, where appropriate," *see id.;* and (3) "in the absence of attendant circumstances that '[cause or] threaten the harm or evil sought to be prevented by [HRS § 712– 1243]' " or "[do] so only to an extent too trivial to warrant the condemnation of conviction," *see* HRS § 702–236(1)(b), possession of an amount of a controlled substance that is "so minuscule that it cannot be sold or used in such a way as to have any discernible effect on the human body," *see State v. Viernes,* 92 Hawai'i 130, 134, 988 P.2d 195, 199 (1999) (citing *State v. Vance,* 61 Haw. 291, 307, 602 P.2d 933, 944 (1979)), constitutes a *de minimis* infraction as a matter of law, *see* Justice Acoba's dissenting opinion at 3. I wish to emphasize, however, that I neither read Justice Acoba's dissenting opinion as establishing a bright line rule, as a universal matter, as to which infractions are factually *de minimis* as a matter of law and which are not, nor necessarily subscribe to the particulars of Justice Acoba's analysis regarding the foregoing three general propositions.

### Dissenting Opinion of ACOBA, J.

Four points are pertinent in this case.

First, there is no majority opinion as to the basis for affirming the trial court in this case. In that regard, I believe the plurality, Moon, C.J., joined by Nakayama, J., is incorrect. In relying on attendant circumstances which were not relevant to the decision of the trial court, the plurality in effect exercises on the appellate level discretion that was only the trial court's to exercise, *see* Hawai'i Revised Statutes (HRS) § 702–236 (1993), and which it did exercise on grounds different from those on which the plurality justifies its holding. As set forth herein, the first attendant circumstance merely reiterated the drug paraphernalia possession charged, and the latter two, the charge of driving under the influence of liquor, all of which were not challenged on appeal.

Second, with all due respect, I must disagree with the position of Justice Ramil that the *de minimis* statute does not apply to the offense of promoting a dangerous drug (methamphetamine) in the third degree, HRS § 712–1243(1) (1993 & Supp.1999). In my view, there is no conflict between HRS §§ 702–236 and 712–1243, and the *de minimis* statute may apply, for the reasons set forth herein. Unless two justices join in this part of the opinion, there is no majority opinion on this court with respect to a rationale rebutting the position of Justice Ramil and supporting the holding in *State v. Vance,* 61 Haw. 291, 602 P.2d 933 (1979), and in *State v. Viernes,* 92 Hawai'i 130, 988 P.2d 195 (1999).

Third, in light of the precepts set forth in *Vance* and *Viernes,* and the evils sought to be abrogated by HRS § 702–236(1)(b), the possession of an amount of drug not (1) saleable or (2) useable, *i.e.* capable of producing an illicit pharmacological effect, or (3) linked to the defendant's involvement in a crime to support a drug habit at the time, is the threshold qualification for establishing that the defendant's conduct either does not cause the harm sought to be proscribed by HRS § 712–1243 or does so to an extent too trivial to warrant conviction. While agreement is not reached on guidelines as to the exercise of the court's discretion in *de minimis* drug cases, this does not preclude the trial courts from utilizing the foregoing three

factors in employing their discretion, since to do so would not "clearly exceed[ ] the bounds of reason or disregard[ ] rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Mara*, 98 Hawai'i 1, 10, 41 P.3d 157, 166 (2002) (citing *State v. Alston*, 75 Haw. 517, 538–39, 865 P.2d 157, 168 (1994)).

Fourth, the facts in this case raise serious questions of law and fact as to whether a defendant in a particular case can "knowingly" possess an unmeasurable amount of prohibited drug found in residue. Notwithstanding any question of law, the issue of whether a defendant, as a *matter of fact*, knowingly possessed such an amount cannot be legally foreclosed.

## I.

As to the appropriate result to be reached in this case, I would hold that the circuit court of the second circuit (the court) abused its discretion in denying the HRS § 702–236 motion of Defendant–Appellant Kalawaianui F. Carmichael (Defendant) to dismiss as *de minimis*, the HRS § 712–1243 charge against him of possessing the dangerous drug methamphetamine in any amount. In light of the unrebutted evidence received by the court, residue weighing .002 grams containing an unknown amount of methamphetamine was not saleable or useable, *i.e.*, capable of producing any illicit pharmacological effect. I would also hold that (1) there is no conflict between HRS § 702–236 and HRS § 712–1243 and both statutes are to be given application, where appropriate, and (2) in the absence of attendant circumstances that "threaten the harm or evil sought to be prevented by the law defining the offense[,]" HRS § 702–236(1)(b), an amount of a drug "so minuscule that it cannot be sold or used in such a way as to have any discernible effect on the human body[,]" *Viernes*, 92 Hawai'i at 134, 988 P.2d at 199 (citing *Vance*, 61 Haw. at 307, 602 P.2d at 944), qualifies as a *de minimis* violation of HRS § 712–1243.

## II.

### A.

On February 13, 1999, Maui Police Department (MPD) Officer Christopher Horton arrested Defendant, a twenty-year-old male, for driving under the influence of intoxicating liquor. During Defendant's booking procedure at the Wailuku police station, a glass pipe containing a "white to brown" crystalline substance, a small plastic straw, and two metal scrapers were recovered from Defendant. The white-to-brown substance was later determined to weigh .002 grams and to "contain methamphetamine," a dangerous drug.

On April 12, 1999, Defendant was charged in a Maui grand jury indictment with (1) driving under the influence of intoxicating liquor (Count I), (2) promoting a dangerous drug (methamphetamine) in the third degree, in violation of HRS § 712–1243(1) (Count II), and (3) prohibited acts related to drug paraphernalia ("to wit, a glass pipe ...") (Count III). HRS § 712–1243 states in relevant part:

(1) A person commits the offense of promoting a dangerous drug in the third degree if the person *knowingly possesses any dangerous drug in any amount*.

. . . .

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall not be less than thirty days.

(Emphasis added.)

On June 4, 1999, Defendant filed a motion to dismiss Count II of the indictment on the ground that his alleged conduct constituted a *de minimis* offense under HRS § 702–236(1)(b). HRS § 702–236(1) states:

The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:

(a) Was within a customary license or tolerance, which was not expressly re-

fused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or

(b) *Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction;* or

(c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

(Emphasis added.) In a supporting memorandum, he argued that, under HRS § 702–236(1)(b), possession of .002 grams of methamphetamine was a *de minimis* infraction because that amount could not be sold or used for either legitimate or illicit purposes. Alternatively, Defendant contended that, under HRS § 702–236(1)(c), the infinitesimal amount recovered, coupled with other factors, such as the harshness of the prescribed sentence—a five-year indeterminate prison term without the possibility of probation—warranted dismissal of the charge.

On June 29, 1999, Plaintiff–Appellee State of Hawai'i (the prosecution) filed an opposing memorandum contending that Defendant's criminal conduct did meet the requirements of HRS § 702–1243(1), because knowing possession of the drug in any amount was the harm sought to be prevented by the statute. The prosecution maintained that "the evidence in this case does not negate the possibility that the drugs were for the Defendant's personal use ... [a]nd although the substance appeared to have been previously smoked, there was still a measurable (useable) quantity of methamphetamine within the pipe." According to the prosecution, the totality of the circumstances weighed in favor of denying Defendant's motion.

### B.

On July 1, 1999, at the hearing on the motion, both parties stipulated that Julie

Wood was qualified to testify as an expert in the drug identification field. It was agreed she would testify, if called as a witness, that: (1) she tested the residue found in the pipe seized; and (2) the *residue* (a) weighed .002 grams, (b) "contain[ed]" methamphetamine, and (c) was visible to the naked eye. In addition, the parties stipulated that a copy of the laboratory report prepared by Wood, containing such findings (Exhibit No. 4), be received into evidence.

The defense then called University of Hawai'i Emeritus Professor of Pharmacology, George W. Read, Ph.D., as its expert witness in pharmacology.[1] According to Read's own testimony and his curriculum vitae, he is emeritus professor of pharmacology at the University of Hawai'i School of Medicine; he received his Bachelor's degree in biology from Stanford University, Master's degree in physiology from Stanford University, and Ph.D. in pharmacology from University of Hawai'i School of Medicine; and he was chairman of a legislative task force on drug abuse and serves on the Hawai'i Commission on Drug Abuse, and has served as its chairman several times. The court duly qualified Read as an expert in pharmacology.

Read testified that pharmacology is "the study of actions of drugs in an organism, especially man, humans," and he relied on "studies related to the effects of drugs either on people or experimental animals[,] simulating effects they would have on people." He had written approximately fifty articles relating to his pharmacological studies and has testified as an expert witness in approximately fifty cases.

Read explained that methamphetamine is a central nervous system (CNS) stimulant, which acts on the brain. Increasing doses, as recounted by Read, results in CNS stimulation and, in a certain dosage range, will produce elation and euphoria. Extrapolating data from various sources,[2] Read concluded

---

1. Read was also the expert witness in *Viernes*, referred to *infra* in the text.

2. According to Read, his sources include: *Drill's Pharmacology in Medicine*, (J.R. DiPalma ed., 3d ed.1965); J.G. Hardman, L.E. Limbird, P.B. Molinoff, R.W. Ruddon, & A.G. Gilman, *Good-man & Gilman's The Pharmacological Basis of Therapeutics* (9th ed.1996); E.H. Ellinwood, *Assault and Homicide Associated with Amphetamine Abuse*, 127 Am J. Psychiatry 9 (1971); R.A. Lehne, *Pharmacology for Nursing Care* (1998); *Poisoning & Drug Overdose*, (K.R. Olson

that the minimum amount required for a "nonuser" to experience any "sort of . . . euphoria or elation" from methamphetamine would fall within "a starting dose" "range of .05 to .1 grams." As explained by Read, extrapolation was necessary because of the unavailability of data concerning the percentages of contaminants in drugs purchased on the streets, the amounts placed in individual pipes, the number of inhalations, the amount of drug absorbed from each inhalation, the duration of drug administration, and tolerance of the individual for the drug.

In reaching his conclusion, Read relied on data and studies concerning therapeutic dosages of methamphetamine (those having a "desirable effect") and amounts reportedly taken by illicit users. According to Read, "dose response" is a

> standard term in pharmacology which simply relates the amount of the drug to the effect it produces, and it is an established accepted standard in pharmacology that the more you give, the more effect you get, and you can start at such a low dose where you get no effect and then increasing the dose you would begin to see an effect.

As related by Read, the legal therapeutic uses for methamphetamine are to treat obesity, narcolepsy, and attention deficit hyperactive disorder (ADHD) in children. Obese persons generally receive between .01 and .04 grams of methamphetamine in pill form for weight control purposes, narcoleptics receive between .03 and .05 grams to combat the desire to sleep, and ADHD children receive between .005 and .015 grams to reduce their tendencies toward hyperactivity.

In questioning from the court about whether methamphetamine pills are manufactured in amounts smaller than five milligrams, Read explained "that .0025 [grams] . . . would be for children [with] ADHD." He further noted that the dose range for ADHD "is for children" because "ADHD [is] rarely treated in adults," and that the dosage for an adult would have to be "scaled . . . up," although the variability in dosage is "correct" for "body size . . . more than age."

ed.1994); R.R. Pinger, W.A. Payne, D.B. Hahn & E.J. Hahn, *Drugs* (2d ed.1995); and T. Sollman,

Read also related that pilots on combat missions during World War II had received doses of methamphetamine between .01 and .04 grams to fight fatigue, although this was "a borderline acceptable use." According to Read, dosages for illicit use had been recorded as ranging from .4 grams to 2.216 grams a day. Based on the studies and research, Read concluded that the minimum effective illicit use dose for an average sized person would be "around .05 grams," although the dose for "a woman weighing eighty pounds . . . may be a little bit lower."

According to him, the "amount bought on the street . . . is usually far from a hundred percent pure." However, the .05 grams he posited in his study was based on "one hundred percent pure drug." As Read understood it, laboratories typically "measure a gross weight [of a sample] . . . so when they weigh something . . . [such as the residue,] the entire weight is not drug."

With respect to the instant case, Read opined that .002 grams of methamphetamine would be equivalent to a few salt granules. However, since the substance was residue which had been scraped from Defendant's presumably already smoked pipe, Read believed the residue would consist of "almost all inactive, inert material with very little drug." In conclusion, Read opined that .002 grams of methamphetamine was not an effective illicit dose, was unsaleable, and was incapable of producing a "pharmacological effect":

> [DEFENSE ATTORNEY] Q. Doctor Read, in your expert opinion would two milligrams or .002 grams be an effective dose or illicit dose?
>
> A. No.
>
> Q. Why not?
>
> A. Because it would not even be effective for these other actions which require less. We are talking about an average adult. I don't think that—well, even in a child for ADHD, there would be a noticeable difference. It is an extremely small amount.

*A Manual of Pharmacology* (1957).

Q. Would .002 grams or two milligrams be usable as an item for sale?

A. I don't know anybody would want to buy it if they can't use it for anything. I mean in the laboratory we might give a dose that size to a physician or rats, but we would never buy it because we would not know its purity. We buy from drug companies where we know absolute purity.

Q. In your expert opinion, could two milligrams produce a pharmacological effect on a user?

A. Not in a human.

On cross-examination, the prosecution established that "if a drug is not very effective by the oral route, it takes far less by the inhalational route" to obtain an effect; that Defendant was "20 years old, 5'8" tall, and weighed 115 [pounds]"; that Read had not "personally used methamphetamine"; that Read had reviewed the police reports prior to the hearing but had not met Defendant, had not "look[ed] at [Defendant's] ... weight," had not observed Defendant "under the influence of methamphetamine," and had no "familiarity ... with Defendant's drug use history, *if any*." (Emphasis added.)

Also at the hearing on July 1, 1999, the prosecutor called MPD Officer Michael Callinan as a witness. Callinan stated that he had participated in over three hundred investigations involving illegal narcotics and had conducted over one hundred narcotics investigations involving methamphetamine. He explained that illicit users typically utilize drug paraphernalia like Defendant's glass pipe, straws, and metal scrapers (Exhibits 1, 2, and 3 respectively). According to Callinan, "the methamphetamine is loaded into the pipe usually with a cut straw into the ball [sic] and to the pipe." He explained that, when a user is "low on product," the user "will [use the metal scraper to] scrape the residue into a grouping or small bunch, and then ... resmoke the residue."

On cross-examination, Callinan reported that he had not received a degree from an accredited college in the area of physical or chemical sciences, he was never assigned to Defendant's case, and his knowledge of the case was limited to "[t]he photos and explaining what the evidence is that was recovered."

In its decision, the court indicated the following:

THE COURT: *We know the Vance case was talking about cocaine,* for which there's no mandatory sentencing. We do know the legislature in addition to prohibiting possession of any amount of drug, methamphetamine, in fact requires mandatory jail terms for possession of this particular drug, so it reemphasized its intent that this is a serious drug and that the potential for harm to our society is very high.

In this case the amount that was—well, let me take a step. I think the de minimis standard is essentially intended for a situation such as where a person borrows the car of another person and then they are arrested and they find some small amount of drugs in the ashtray or something like that,[3] or circumstances that don't indicate the person was actively smoking, or ingesting the drug or using the drug.[4]

Not that it is just—*I don't think it is intended to provide a bright line for a certain amount, and also it is apparent that even the Supreme Court is using the wrong terminology, that is to say the word narcotic. Apparently, that's not appropriate for use with the drug methamphetamine.* I am interpreting that to mean any effects on the central nervous system.

The expert talked about, well, what he means street use, how much does it take to get a person high, which is problematical, because you have all these variables, what their tolerance might be, how much they

---

3. Of course, in the absence of "knowing" possession of the drugs, the borrower of the car would not be subject to any criminal liability unless the offense of possession was a strict liability offense. The hypothetical posed by the court is one in which the borrower would not be guilty, in which case the *de minimis* statute would not apply.

4. It is not apparent what the term "actively," as used by the court, denotes. As the facts indicate, Defendant was not smoking, ingesting, or using any drug at the time of his apprehension. Accordingly, Defendant qualified for *de minimis* treatment under this example.

weigh, how pure it is. *We know, for instance, that a therapeutic amount is as low as .0025, and apparently pills are available in that amount for treatment for attention deficit disorder, so it is hard to say .002 is just not meant to be concerned about* when we're talking about methamphetamine, and I think I have to take into consideration the circumstances here.

*What is in evidence is that this was a pipe which is commonly used for smoking methamphetamine, that residue in a pipe can be commonly used by people to smoke methamphetamine,* and I just don't feel in the totality of the circumstances of this case that I should exercise discretion of the Court and find that this was a de minimus [sic] infraction, so I am going to deny the motion. Prepare the order, please.

(Emphases added.) A written order denying the motion to dismiss was subsequently filed on July 23, 1999.

### C.

On July 29, 1999, Defendant withdrew his original plea of not guilty and entered a plea of no contest as part of a plea agreement with the prosecution. As part of the agreement, Defendant reserved his right to appeal the issues raised in this case. The court accepted Defendant's no contest plea pursuant to the plea agreement, in accordance with Hawai'i Rules of Penal Procedure Rule 11(a)(2). On September 23, 1999, the court sentenced Defendant.

### III.

Defendant appeals the July 23, 1999 order denying his motion to dismiss Count II of the indictment on the ground that the court abused its discretion. Since arguments in the briefs relate only to Count II, the judgment and sentences rendered on Counts I and III must be affirmed. The question is whether Defendant's conduct at issue in Count II amounted to a *de minimis* offense.

### IV.

In reviewing a trial court's decision for abuse of discretion, we must determine whether the court "clearly exceed[ed] the bounds of reason or disregard[ed] rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Klinge,* 92 Hawai'i 577, 584, 994 P.2d 509, 516 (2000) (citations omitted); *see also State v. Sacoco,* 45 Haw. 288, 292, 367 P.2d 11, 13 (1961). I must conclude that the court abused its discretion in denying Defendant's motion to dismiss.

### V.

The prosecution's decision to charge Defendant with possession of drugs based on methamphetamine in residue recovered from the glass pipe essentially converts the crime of prohibited acts related to drug paraphernalia into two separate charges—promoting a dangerous drug and prohibited acts relating to drug paraphernalia. The presence of the drug within the residue in the glass pipe plainly relates to the identification of the pipe as *drug paraphernalia. See State v. Kupihea,* 98 Hawai'i 196, 206, 46 P.3d 498, 508 (2002) ("[I]t is not the intrinsic nature of the thing that is determinative, but the culpable state of mind with which the thing is used, or possessed with intent to use, that 'convert[s] the [thing] into prohibited drug paraphernalia.' " (Quoting *State v. Lee,* 75 Haw. 80, 109, 856 P.2d 1246, 1262 (1993). (Some brackets added, some in original.))). Thus, the prosecution utilizes evidence for the drug paraphernalia charge to establish proof of the drug promotion charge, although the amount of drug is so infinitesimal as to be unmeasurable.

In providing for dismissal of prosecutions where the defendant's conduct did not actually cause or threaten the harm proscribed or did so in a very trivial sense, HRS § 702–236 reflects the reciprocal principle of the policy underlying the penal code of protecting against "specific offenses which constitute harms to social interests." Commentary on HRS § 701–103. In that connection, this court, in *Vance,* indicated that a charge under HRS § 712–1243 involving "possession of a microscopic trace of a dangerous drug" may be subject to dismissal under HRS § 702–236 as "not actually caus[ing] or threaten[ing] the harm sought to be prevent-

ed by [HRS § 712–1243] or [doing] so only to an extent too trivial to warrant condemnation of conviction." 61 Haw. at 307, 602 P.2d at 944.

While the specific drugs involved in *Vance* were cocaine and secobarbital, *see id.* at 305, 602 P.2d at 943, and, thus, "narcotic drugs," as the court noted, the fact that methamphetamine is not a narcotic drug would not preclude application of the principles set forth in *Vance*. *Id.* As Read explained, the term "narcotic" refers to a drug that is a depressant,[5] although the term has "evolved" into a definition for an "addict[ive]" drug. In *Vance*, this court's analysis generally concerned "a literal application of" HRS § 712–1243 in a prosecution "for possession of a microscopic trace of a *dangerous drug*," *id.* at 307, 602 P.2d at 944 (emphasis added), and, therefore, pertained to all such "dangerous drugs," not only those drugs which could be said to have a narcotic or addictive effect.

## VI.

In rejecting Defendant's motion, the court considered as attendant "circumstances" that the "pipe was commonly used for smoking methamphetamine, [and] that residue in a pipe can be commonly used by people to smoke [it]." The former circumstance reiterates nothing more than that the pipe was drug paraphernalia as charged in Count III. The latter circumstance, apparently relying in part on Officer Callinan's testimony, related only to the underlying facts constituting the offense of promoting a dangerous drug. Combined, they support a finding that Defendant violated HRS § 712–1243, a prerequisite for invocation of HRS § 702–236, but not for a *per se* disqualification of the dispensation afforded under HRS § 702–236.

Under HRS § 702–236, the court must have "regard to the nature of the conduct alleged and the nature of the attendant circumstances[.]" Here, the nature of the conduct alleged is the possession of any amount of a dangerous drug. *See* HRS § 712–1243(1). It is uncontroverted that Defendant possessed a white-to-brown substance weighing .002 grams and containing an indeterminate amount—but obviously less than .002 grams—of methamphetamine. "[T]he possession of a microscopic amount in combination with other factors indicating an inability to use or sell the [drug] may constitute a de minimis infraction." *Vance*, 61 Haw. at 307, 602 P.2d at 944. Conversely, then, possession, along with circumstances demonstrating the accompanying ability to use or to sell or to distribute the drug, would disqualify a defendant from *de minimis* consideration. *See id.*

Other "attendant circumstances" may also disqualify a defendant from *de minimis* consideration, pursuant to HRS § 702–236(1)(b), if they implicate the "harm or evil sought to be controlled." With regard to dangerous drugs in general, the legislature had in mind a secondary purpose, which was to prevent crimes prompted by the need to obtain more dangerous drugs, which the legislature believed was caused by abuse of highly addictive drugs. Commentary on HRS §§ 712–1241 to 712–1250.[6]

As Justice Ramil notes (as did the *Viernes* court), the legislative history regarding amendments adopted by the legislature in 1996 confirms this secondary purpose. *See* Ramil, J., dissenting/concurring opinion at 6. In those amendments, the legislature "increased the penalties attendant to the possession or distribution of methamphetamines

5. In responding to the court's comment that "from a scientific point of view, it would be impossible for methamphetamine to have a narcotic effect," Read responded, "Right. Just the opposite. That's why it is used in narcolepsy."

6. As the Commentary on HRS §§ 712–1241 to 712–1250 states with regard to dangerous drugs, [t]hese drugs are the most fearsome in their potential for destruction of physical and mental well being. *The drugs of this category are characterized by a high tolerance level which requires the user to use greater and greater*

*amounts each time to achieve the same "high."* More importantly, all the drugs, with the exception of cocaine to some extent, are highly addictive; that is, if use of the drug is discontinued, severe withdrawal symptoms occur which can be relieved only by more of the drug. *The combination of a high tolerance level and addictive liability creates a physical dependence in the user which may lead, and in many cases has led, the user to commit crimes to obtain money needed to buy more narcotics.* (Emphases added.) (Footnotes omitted.)

'to counter increased property and violent crimes.' " *Viernes,* 92 Hawai'i at 134, 988 P.2d at 199 (quoting 1996 Haw. Sess. L. Act 308, at 970).

Thus, as in this court's view in *Vance* and *Viernes,* the legislative history, as well as the statutory scheme and its accompanying commentary, reflect that: (1) the primary harm and evil sought to be prevented in proscribing drug-related offenses is abuse; and (2) correlative to the abuse of dangerous drugs, a secondary harm and evil sought to be prevented is crime prompted by such abuse.[7] Accordingly, disqualifying attendant circumstances may also exist where there is evidence that a defendant committed a crime in order to obtain more drugs.[8]

There is no evidence of a sale or distribution of the dangerous drug here, or of secondary effects of the nature described *supra,* and neither the court in its ruling, nor the prosecution on appeal, indicate so. *See also supra* note 4. Rather, the court, and the parties in their briefs, focus on whether or not the amount of the drug involved constituted a useable amount.

7. An example of attendant circumstances which "actually cause[s] or threaten[s] the harm or evil sought to be prevented by the law[,]" HRS § 702–236(1)(b), is a case where the defendant, who is apprehended in the course of committing armed robbery, may have committed a crime to "feed" his drug habit. In a search incident to this arrest, a pipe containing cocaine residue is recovered, together with a scraper and a lighter, but, other than the money obtained as a result of the robbery, no other cash is recovered. Also recovered from the person of the defendant is a telephone number which, the prosecution establishes, is the phone number of a known drug dealer. In this example, attendant circumstances would suggest that the defendant may have committed the robbery in order to maintain his drug addition, one of the secondary social harms sought to be prevented by HRS § 712–1243.

8. To the extent that Justice Ramil relies on *State v. Schofill,* 63 Haw. 77, 621 P.2d 364 (1980), for the proposition that "[t]raffic in narcotics can hardly be said to be a *de minimis* offense," *id.* at 84, 621 P.2d at 370, that case is readily distinguishable. In *Schofill,* the defendant was convicted of promoting a dangerous drug in the first degree for his involvement as a middle-man between a source and an undercover police officer. The drug involved was cocaine, the amount was a quarter of an ounce, and the price was $550.00. *See id.* at 78–80, 621 P.2d at 366–67. No cocaine, however, was introduced into evi-

## VII.

In that regard, *Vance* established that, "where the amount [of the dangerous drug] is microscopic or is infinitesimal and [is] in fact unusable[,] ... the possibility of unlawful ... use does not exist[.]" 61 Haw. at 307, 602 P.2d at 944. Thus, "an inability to use ... may constitute a de minimis infraction within the meaning of HRS § 702–236 ... warrant[ing] dismissal of the charge otherwise sustainable under HRS § 712–1243." *Id.* In other words, although possession of "any amount" of methamphetamine "technically violates HRS § 712–1243," it may "nonetheless [be] *de minimis* pursuant to HRS § 702–236." *Viernes,* 92 Hawai'i at 135, 988 P.2d at 200.

The court was correct in its assessment that this court has not established "a bright line" establishing what quantity of any particular drug is "useable" and, hence, outside the scope of *de minimis* consideration and what quantity is "unuseable" and, thus, appropriate for such consideration. The avoid-

dence at trial and the purchase was never consummated. *See id.* at 80, 621 P.2d at 367–68. By statute, however, "distribution" includes an offer or agreement to sell a controlled substance. *See* HRS § 712–1240. On appeal, this court observed, without analysis, that the circuit court should not have dismissed the indictment on the ground that the defendant's conduct constituted a *de minimis* infraction. *See Schofill,* 63 Haw. at 84, 621 P.2d at 370. In this regard, this court merely noted that the charged offense constituted a class A felony, punishable by imprisonment for a period of twenty years, and asserted that "[t]raffic in narcotics can hardly be said to be a *de minimis* offense." *Id.* (emphasis added). *Schofill* is inapposite in the context of a person who merely *possesses* a trace amount of a controlled substance. *Schofill* cited *State v. Caldeira,* 61 Haw. 285, 602 P.2d 930 (1979). *Caldeira,* however, is not a case involving the *de minimis* statute, but whether two defendants were subject to sentencing enhancements because of their recidivism with respect to promoting controlled substances. *See id.* at 286–87, 602 P.2d at 931. This court rejected the defendants' contention that engaging in drug trafficking was a "nonviolent" crime and took the opportunity to discuss at some length the violence wreaked on society by the wholesalers and pushers engaged in the drug trade. *See id.* at 287–89, 602 P.2d at 931–33. Thus, *Caldeira* is not on point.

ance of a "bright line approach," defining what amount of drug possessed constitutes a criminal offense, rests on this court's recognition that the legislature, in enacting HRS §§ 712–1241 to –1243, "devised [the] entire scheme of sanctions [for the offenses of promoting dangerous drugs] on the basis of the amounts involved[, t]hus ... prohibit[ing] us from judicially amending [HRS § 712–1243] to include a useable quantity standard." *Vance,* 61 Haw. at 307, 602 P.2d at 944. This proposition was reaffirmed in *Viernes,* because "the determination of the amount of a drug necessary to constitute an offense falls solely within the purview of the legislature." 92 Hawai'i at 135, 988 P.2d at 200.

### VIII.

In drawing a distinction between unuseable and useable amounts, this court said in *Vance* that, "[w]here the amount of narcotics possessed is an amount which can be used *as a narcotic,* the probability of use is very high and the protection of society demands that the possession be proscribed." 61 Haw. at 307, 602 P.2d at 944 (emphasis added). It follows from *Vance* that a useable amount, which disqualifies a defendant from HRS § 702–236 consideration, is one which produces the subject drug's characteristically desired effect: in *Vance,* a narcotic effect, or, in this case, according to the uncontroverted testimony of Read, one of euphoria or elation. *See Viernes,* 92 Hawai'i at 134 n. 6, 988 P.2d at 199 n. 6 ("The *Vance* court did not suggest that *any* 'useable' substance posed a potential evil, but, rather, only those substances 'which can be used as a narcotic.' ") Analogously, then, the amount of methamphetamine which would disqualify a defendant from *de minimis* consideration would be a "useable amount," that is, the minimal amount sufficient to produce the pharmacological effect sought by an illicit user.

### IX.

According to the evidence adduced in this case, that amount, as conservatively estimated by Read, would be .05 grams "of one hundred per cent pure drug," as a first-time dose for an "average-sized" person who was not a user. The only qualification on that

amount elicited from Read was that a "little less" would produce an effect in an eighty-pound person—clearly a qualification not applicable to the five-foot, eight-inch, 115–pound adult Defendant in the instant case.

In reference to the specific facts of this case, Read's unrebutted testimony was that .002 grams of methamphetamine would not "produce a pharmacological effect on a [human adult] user" and "that ... even in a child for ADHD, there would [not] be a noticeable difference." Despite this testimony, the court stated, "[I]t is hard to say .002 [grams] is just not meant to be concerned about." The court then, in effect, ruled that an amount even less than that of "therapeutic amount *as low* as .0025" (emphasis added), administered to *children* for ADHD, would have the prohibited effect on Defendant. In my view, this determination has no support in the evidence adduced at the hearing.

Moreover, the prosecution's laboratory report indicates that .002 grams was the gross weight of the residue that "contained methamphetamine" and, thus, was not the weight of the methamphetamine itself. Similarly uncontroverted was Read's opinion that illegal methamphetamine is not found in a pure state, supporting the conclusion that the quantity of methamphetamine actually in the residue was further diluted. Finally, Read concluded that, after smoking, "the residue that's left is the inactive, inert material, so if it is from a pipe, it is going to be *almost all* inert material with very little drug." (Emphasis added.)

In sum, the prosecution adduced no evidence controverting Read's conclusion that .002 grams of residue containing an unknown amount of methamphetamine, much less .002 grams of pure methamphetamine, under the circumstances of this case, was not saleable or useable. Based on Read's undisputed testimony, because almost all of the residue was inactive, inert material, the amount of methamphetamine would have had to be less than .002 grams.

### X.

The prosecution argues that (1) this case involves double the .001 grams of metham-

phetamine at issue in *Viernes*,[9] (2) methamphetamine in the amount of .0025 grams is available for children with ADHD, (3) a smaller drug dose, if inhaled, will result in more of an effect than if ingested, (4) individuals have different tolerance levels, and (5) it could be inferred that the residue was saved for future use. However, the overriding precept adduced from the evidence at the hearing was that .002 grams of a *residue* containing methamphetamine was not saleable or useable by an adult within the HRS § 702–236 framework set forth in *Vance* and confirmed in *Viernes*. Additionally, even accepting these contentions at face value, there was no evidence as to argument (3), *i.e.*, that inhaling what methamphetamine was left in the .002 grams of residue would have a "pharmacological effect," argument (4), *i.e.*, that Defendant's level of "tolerance," if proven, would result in an atypical response, or argument (5), *i.e.*, that whatever "future use" the residue would be put to would result in a "pharmacological effect."

## XI.

The plurality contends that Defendant failed to produce evidence controverting the following attendant circumstances: "(1) Carmichael's possession of multiple items associated with the use and distribution of methamphetamine and (2) his driving at excessive speed immediately prior to being apprehended; and (3) the arresting officer's determination that Carmichael appeared impaired." Plurality, 99 Hawai'i at 80, 53 P.3d at 219. The first attendant circumstance merely reflects the fact that Defendant was charged with drug paraphernalia possession. The second and third circumstances relates to the separate and unassociated charge of driving under the influence of alcohol, apparently thought irrelevant or immaterial, inasmuch as they were not adressed by the trial court in its oral findings.

When we consider whether a trial court has abused its discretion in applying or refusing to apply the *de minimis* statute, it is necessary to examine the factors the trial court itself relied upon in reaching its conclusion. Only then can we assess whether or not the court's decision "clearly exceed[ed] the bounds of reason or disregard[ed] rules or principles of law." *Klinge*, 92 Hawai'i at 584, 994 P.2d at 516 (citation omitted). If facts not argued or relied upon by the trial court are considered, this court would ignore the trial judge's use (or misuse) of that discretion and usurp it. We would then be substituting our own reasoning for the court's and, in doing so, would be exercising the discretion reserved to the trial court.

Chief Justice Moon's opinion, in justifying the trial court's decision based on reasons not utilized by the court, only underscores the lack of reason in the trial court's actual decision by substituting for it grounds not announced by the trial judge. With all due respect, I believe his opinion essentially supplants the trial judge's thinking with his own. As discussed *supra*, Defendant did adduce considerable evidence in satisfying his burden and the basis given by the court for denying the *de minimis* motion was not supported by the evidence.

## XII.

With respect to whether the *de minimis* statute applies, I must respectfully disagree with Justice Ramil. By its plain language, HRS § 712–1243 prohibits the possession of "any amount" of methamphetamine. The intent of a statute is normally to be obtained from the language of the statute itself. *See, e.g., State v. Aplaca*, 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001); *State v. Rauch*, 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000). It is not controverted that HRS § 712–1243 is plain and unambiguous, *see* Ramil, J., dissenting/concurring opinion at 3, but, I note, no more so than HRS § 702–236.

### A.

Justice Ramil reasons that HRS §§ 712–1243 and 702–236 should be construed *in pari materia*, and, as such, they are in irreconcilable conflict; therefore, according to Justice Ramil, the "specific" statute, HRS

---

9. Similarly, the .001 grams in *Viernes* was the gross weight of the residue and not of the methamphetamine. *See Viernes*, 92 Hawai'i at 134 n. 5, 988 P.2d at 199 n. 5.

§ 712–1243, should control over the "general" statute, HRS § 702–236. HRS § 1–16 (1993) does state that "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other" and that "[w]hat is clear in one statute may be called in aid to explain what is doubtful in another." "Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object." 2B *Sutherland Statutory Construction* § 51.03, at 201–02 (6th ed.2000).

Of course, the relatedness of the statutes, in that they both appear in the Hawai'i Penal Code (HPC) or that both may arise within the context of a single prosecution, is not determinative of whether they are *in pari materia* with one another. "There is more to the problem than simply finding out whether the different statutes are related, since all statutes are related as component elements in a single legal system. The object of all statutes is the ordering of legal relationships." *Id.* § 51.03, at 202. In that regard, we do not believe an *in pari materia* construction is applicable.

**B.**

The *in pari materia* rule relates primarily to construction of an *ambiguous statute. See* HRS § 1–16; *see also* 2B *Sutherland Statutory Construction,* § 51.03, at 202 ("The rule of in pari materia is generally used when there is some doubt or ambiguity in the wording of the statute under consideration."). As mentioned, I do not disagree that the statutes are not ambiguous or their wording doubtful. Hence, the need to refer to either HRS § 702–236 or § 712–1243 in order to interpret the other does not arise. Nor do the statutes address *the same subject matter.* As Justice Ramil points out, " 'where there is a "plainly irreconcilable" conflict between a general and specific statute concerning the same subject matter, the specific will be favored.' "[10] Ramil, J., dissenting/concurring opinion 99 Hawai'i at 81, 53 P.3d at 220 (quoting *State v. Putnam,* 93 Hawai'i 362, 373, 3 P.3d 1239, 1250 (2000) (other citations omitted)). However, HRS § 712–1243 does not supercede HRS § 702–236 because they do not relate to the same subject matter.[11]

HRS §§ 702–236 and 712–1243 reflect differing legislative objectives. As indicated in

**10.** Justice Ramil contends that the phrase within HRS § 712–1243, "in any amount[,]" "creates the inference of a zero tolerance policy that leaves no room for discussion on the quantity of drug possessed." Ramil, J., dissenting/concurring opinion 99 Hawai'i at 81, 53 P.3d at 220. According to Justice Ramil, given this clear indication that "possession of 'any amount' is intended to be an indismissible violation of the act[,]" *id.* at 82, 53 P.3d at 221, application of HRS § 702–236, which "would result in a judgment or order of dismissal[,]" *id.* at 83, 53 P.3d at 222, creates an irreconcilable conflict. It is argued that, "[t]hus, in accordance with statutory construction, the court is compelled to favor HRS § 712–1243, a specific statute, over HRS § 702–236, a general statute." *Id.* at 83, 53 P.3d at 222. Based on the analysis *infra,* I do not perceive a conflict.

This "zero tolerance policy," according to Justice Ramil, is further evinced by the 1996 amendment to HRS § 712–1243, which added the words "[n]otwithstanding any law to the contrary" and a mandatory minimum term of imprisonment, dissenting opinion at 83, 53 P.3d at 222 (quoting HRS § 712–1243(3) (1972), added by 1996 Haw. Sess. L. Act 308, at 972), as well as the legislative history which indicates the purpose of HRS § 712–1243 is to " 'respond to "abuse and social harm," ' " *id.* at 82, 53 P.3d at 221 (quoting *Viernes,* 92 Hawai'i at 134, 988 P.2d at 199 (other citation omitted)).

I observe, however, that the language cited, that is, "[n]otwithstanding any law to the contrary," *id.* at 82, 53 P.3d at 221, deals solely with the imposition of a mandatory minimum term of imprisonment for those convicted of promoting a dangerous drug in the third degree. "Any law to the contrary" refers, then, to *sentencing* laws and not to laws generally, including HRS § 702–236.

**11.** As developed in our case law, the reference to "same subject matter" as applied in context of the HPC has been viewed narrowly, requiring substantially similar or identical issues and not simply invoked by inclusion in the HPC itself. *See State v. Kalama,* 94 Hawai'i 60, 66, 8 P.3d 1224, 1230 (2000) ("This construction is confirmed by an *in pari materia* reading of HRS §§ 707–734 and –733(1)(b), both of which concern exposure of a person's genitals to another person."); *Putnam,* 93 Hawai'i at 370–71, 3 P.3d at 1247–48 (construing HRS §§ 706–667 and –625, both of which relate to sentencing); *State v. Dudoit,* 90 Hawai'i 262, 270, 978 P.2d 700, 708 (1999) ("Construed together, HRS §§ 701–101, 701–102, 701–107, and 701–108 [which define the term 'offense,'] establish that the term 'offense,' as employed by the HPC, refers to the commission of the crime or violation and not to the procedural events that transpire as a result of that commission, *e.g.,* prosecution, conviction (upon adjudication of guilt), and sentencing." (Footnote omitted.)).

*Viernes,* "[t]he legislative purpose of the penal statutes relating to drugs and intoxicating compounds—including HRS § 712–1243—is to respond to 'abuse and social harm.' " 92 Hawai'i at 134, 988 P.2d at 199. HRS § 702–236, however, responds to a' different legislative purpose—that of mitigating the effects of criminal statutes, including, but not limited to, HRS § 712–1243, when the evil sought to be controlled by the statute is absent or the violation trivial. *See* HRS § 702–236.

Accordingly, the statutory scheme, which encompasses both of these legislative objectives, does not evince a "zero tolerance" policy, which would abolish the availability of the dispensation contained in the *de minimis* provisions. *See Vance,* 61 Haw. at 307, 602 P.2d at 944 ("[T]he possession of a microscopic amount in combination with other factors indicating an inability to use or sell the narcotic, may constitute a de minimis infraction within the meaning of HRS § 702–236[.]"), and *Viernes,* 92 Hawai'i at 134, 988 P.2d at 199 ("[I]f the quantity of a controlled substance is so minuscule that it cannot be sold or used in such a way as to have any discernible effect on the human body, it follows that the drug cannot lead to abuse, social harm, or property and violent crimes.").

As HRS § 712–1243 and HRS § 702–236 address separate policies, one prescribing prohibited conduct in connection with drug possession and the other, dismissal of a prosecution once such conduct has been established, *a fortiorari* they are not concerned with the same statutory objectives. That there is no conflict between the two statutes follows from the truism that HRS § 702–236 is not operative unless the subject statute, here, HRS § 712–1243, has been violated.[12] Hence, the application of the *de minimis* statute does not reject, but rests on the fact that the defendant has committed the crime.

The underlying premise for the application of HRS § 702–236, then, is that a violation of the statute involved has occurred. In affirming that such culpability exists, but providing that a conviction should not be imposed if either the conduct of the defendant does not cause the harm sought to be circumscribed or that it does so to an extent too trivial to warrant condemnation, HRS § 702–236 embodies a policy intended to complement the disposition of all offenses, including one under HRS § 712–1243, that would result from violative conduct. Therefore, HRS; § 702–236 does not clash with HRS § 712–1243 but, like it, confirms the fact of culpability.

## C.

It is said that *Viernes* should be overruled based on "public policy considerations." Ramil, J., dissenting/concurring opinion 99 Hawai'i at 85, 53 P.3d at 224. The first of these considerations rests on the proposition that "applying the *de minimis* statute [where residue in a pipe is present] ... would effectively ... reward[ ] the person who uses more (as opposed to less) of the drug." *Id.* at 85, 53 P.3d at 224.

While someone at some time in the past may have smoked enough drugs in a pipe to

---

**12.** Any other analysis yields an inconsistent result when applied. Declaring that HRS § 702–236, as a general statute, is superceded by other, specific statutes within the HPC, would arguably mean that the *de minimis* statute could never apply to any criminal conviction. For example, HRS § 707–727(1)(b)(Supp.2001) makes it a crime (custodial interference in the second degree) for people to "intentionally or knowingly take[ ] ... from lawful custody any ... person entrusted by authority of law to the custody of another person or an institution." Under a contrary analysis, a person who invites a minor into his home whom he or she knows has fled from foster custody in order to provide the minor with a safe haven, would be convicted of the crime.

However, this court, in *State v. Akina,* 73 Haw. 75, 828 P.2d 269 (1992), found such behavior *de*

*minimis* under HRS § 702–236(1)(b) because it was "too trivial to warrant the condemnation of conviction." *Id.* at 79, 828 P.2d at 272. The trial court had "rejected defendant's assertion that [HRS] § 702–236(1)(b) shielded him from prosecution, reasoning that defendant's actions fell within the terms of § 707–727(1)(a) and that a conviction would comply with legislative intent." *Id.* at 77, 828 P.2d at 271. This court, however, determined that the defendant's actions were too trivial to warrant condemnation, and the trial court had abused its discretion by not dismissing the charge against him. *See id.* Therefore, although Akina's behavior was prohibited under the plain language of HRS § 707–727, the *Akina* court considered the *de minimis* statute applicable.

leave a trace residue, who smoked it, when, and in what amount is entirely speculative. To permit disqualification from *de minimis* consideration on that basis would run counter to our notion that the presumption of innocence applies as to any potential past possession by the defendant for which there is no evidence except the residue itself, and that culpability should rest on the evidence obtained. A possession offense necessarily requires more proof than mere speculation that it is likely that, at some time in the recent past, a defendant probably had drugs in his or her possession.

In *People v. Sullivan*, 234 Cal.App.2d 562, 44 Cal.Rptr. 524, 526 (1965), the defendant was arrested with only trace amounts of narcotic on assorted drug paraphernalia. In reversing a conviction for knowing possession of a narcotic, the court applied case law that had held "that where a narcotic is imperceptible to the human eye and its presence can only be detected through chemical analysis, the evidence is insufficient to sustain a conviction for known possession of the narcotic." *Id.* at 525 (referring to *People v. Aguilar*, 223 Cal.App.2d 119, 35 Cal.Rptr. 516 (1964)). In disagreeing with the prosecution's contention that the narcotic was possessed "knowingly," based upon the fact that the defendant admitted using drugs earlier in the day, the appellate court noted with disfavor the consequences which would result from such an approach:

> The logic of this contention would convert evidence of recent past possession of narcotics into proof of present possession of narcotics .... Were we to accept evidence of recent past possession of narcotics as equivalent to proof of present possession of narcotics, then we could charge every addict who was currently [under the influence of narcotics] with possession of a narcotic, since he [or she] must have had possession of the narcotic in the recent past in order to come under its influence.

*Id.* at 526. *See also People v. Fein*, 4 Cal.3d 747, 94 Cal.Rptr. 607, 612, 484 P.2d 583 (1971), *superceded by statute on other grounds as stated in People v. Lissauer*, 169 Cal.App.3d 413, 422 n. 6, 215 Cal.Rptr. 335 (1985) ("Although the presence of two burnt marijuana seeds might reasonably suggest that defendant or another occupant of the apartment formerly possessed and used marijuana, that inference would not justify their arrest for present use, possession or sale."). I believe it would contravene the objectives underlying HRS § 702–236 to rest a blanket rejection in a case involving possession of trace amounts of a drug on an unproven or speculative assumption of prior possession of a greater amount.

The second policy concern is that, in not adhering to an "any amount" standard, there would be a "distort[ion of] trials [where] the issue becomes what amount of drug was recoverable, and what 'discernible effect' that drug has." Ramil, J., dissenting/concurring opinion 99 Hawai'i at 85, 53 P.3d at 224. However, this is unlikely, inasmuch as at trial the prosecution's burden of proof regarding the elements of a HRS § 712–1243 offense, including possession and the requisite state of mind, *see* HRS § 712–1243; HRS § 701–114 (1993), are not disposed of by the amount of methamphetamine found. The amount becomes an issue only when a defendant has filed a motion under HRS § 702–236, which is generally not decided at trial. Even if evidence with respect to *de minimis* factors are adduced at trial, evidence of such factors would not be extensive, because they are often related to the circumstances of the arrest, and any potential untoward effects may be avoided through a cautionary instruction if necessary.

The third policy consideration posited is the possibility that "application of [the de minimis statute] to drug possession cases is destined to lead to contradictory, if not absurd, results [because] the result could well differ from courtroom to courtroom and expert to expert" if expert testimony establishes criminal culpability thresholds. Ramil, J., dissenting/concurring opinion 99 Hawai'i at 86, 53 P.3d at 225 (footnote omitted). In *Vance*, this court recognized that the legislature determines the amount of prohibited drugs for which possession is proscribed. *See Vance*, 61 Haw. at 306–07, 602 P.2d at 944. In *Viernes*, this court adhered to that fundamental proposition, confirming that, "[a]s pointed out in *Vance*, the determination

of the amount of a drug necessary to *constitute an offense* falls solely within the purview of the legislature." *Viernes,* 92 Hawai'i at 135, 988 P.2d at 200 (emphasis added).

In my view, the variations in results that concern Justice Ramil may be minimized by the trial court's consideration of the three factors identified in *Vance, Viernes,* and the legislative history of HRS § 712–1243. *See supra* 99 Hawai'i page 81, 53 P.3d page 220. Any perceived variations in results would then be a consequence of the particular circumstances of individual cases. Also, I do not believe that a pharmacological expert would necessarily be required in every case in order to establish that a substance was not useable or saleable.

The fourth consideration presented is that a defendant's prior history of drug use may be brought out at trial in order to show tolerance to drug use. *See* Ramil, J., dissenting/concurring opinion 99 Hawai'i at 86, 53 P.3d at 225. However, the application of HRS § 702–236 generally arises only in the course of a *pretrial* motion to dismiss on *de minimis* grounds and introduction of such prior use may be avoided in a trial by appropriate court order.

### XIII.

In *Vance,* this court announced long ago that the *de minimis* statute may be applied to drug offenses. *See* 61 Haw. at 307, 602 P.2d at 944. In doing so, it did no more than acknowledge the scope of HRS § 702–236, which extends to all offenses. In *Viernes,* this court sought to harmonize the legislative objectives of HRS § 702–236 and HRS § 712–1243 in light of *Vance,* holding that *de minimis* consideration can be applied where the amount of methamphetamine possessed would not produce an illicit effect. *See* 92 Hawai'i at 134, 988 P.2d at 199. Garnered from this history, then, I conclude that the threshold qualification establishing that the defendant's conduct either does not cause the harm sought to be proscribed by HRS § 712–1243 or does so to an extent too trivial to warrant conviction is possession of an amount of drug not (1) saleable or (2) usea-

ble, *i.e.* capable of producing an illicit pharmacological effect, or (3) linked to the defendant's involvement in a crime to support a drug habit at the time. The foregoing three factors may be readily employed by the trial courts in exercising their discretion in *de minimis* drug cases, inasmuch as to do so would not constitute an abuse of discretion.

### XIV.

In light of the unmeasurable amount possessed, serious questions arise as a matter of law as to whether Defendant could knowingly possess such amount. Even were the possession of an unmeasurable amount not resolvable as a matter of law, the question remains as to whether a particular defendant, as a matter of fact, knowingly possessed an unmeasurable amount contained in residue. That issue cannot be legally foreclosed; to hold so would make possession not a "knowing" offense but one of strict liability. *See* HRS § 702–212 (1993) (explaining that "the state of mind requirements" of the HPC "do not apply to . . . [a] crime defined by statute other than this Code, insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears")

### XV.

Considering the evidence adduced at the hearing, and the lack of any challenge to Read's credibility, I would hold that the court's denial of Defendant's motion exceeded the bounds of reason. Therefore, I would vacate (1) the court's July 23, 1999 order denying Defendant's motion and (2) the judgment and sentence insofar as it relates to Count II. I would remand the case and instruct that the court enter an order dismissing Count II and that it amend the September 23, 1999 judgment and sentence accordingly.[13]

---

**13.** Because I believe that the court abused its

discretion in denying the motion to dismiss on

the grounds set forth in HRS § 702–236(1)(b), I do not consider the arguments of the parties with respect to HRS § 702–236(1)(c).